UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NICHOLAS ADDUCI, | ) |
| Plaintiff, | ) No. 21-cv-6326 |
| v. | ) Magistrate Judge Keri L. Holleb Hotaling |
| THOMAS J. DART, Sheriff of Cook County (official capacity) & County of Cook, a unit of local government as indemnitor, | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Nicholas Adduci, a long-time Cook County Sheriff's Office ("CCSO") employee, alleges CCSO violated his rights under the Americans with Disabilities Act during the COVID-19 pandemic by approving him for unpaid leave rather than returning him to work with certain accommodations. (First Amended Complaint ("FAC"), Dkt. 27.) Before the Court is Defendants' fully briefed motion for summary judgment (Dkt. 68), which, for the reasons stated below, is granted.

**BACKGROUND**[1]

Plaintiff Nicholas Adduci was diagnosed with Type 1 diabetes in 1998 and uses an insulin pump, continuous glucose monitor, and blood glucose kit to manage his condition. (DSOF ¶ 31.) Plaintiff was hired by CCSO's Court Services Department ("CSD") as a Court Services Deputy Sheriff ("CSDS") in 2004. (DSOF ¶ 1.) Plaintiff was a sworn and deputized security officer, a front-line emergency responder, and a member of the Illinois Fraternal Order of Police Labor

---

[1] Throughout this opinion, the Court cites to Defendants' LR 56.1 statement of facts (Dkt. 70) as "DSOF," to Plaintiff's response to that statement (Dkt. 78 at 1-39) as "PRDSOF," to Plaintiff's Statement of Additional Facts (Dkt. 78 at 39-41) as "PSOAF," and to Defendants' response to Plaintiff's statement (Dkt. 89) as "DRPSOAF."

Council Union, subject to the Collective Bargaining Agreement effective for years 2017 to 2020 ("CBA"). (DSOF ¶¶ 3, 4; PRDSOF ¶ 3.)[2] Between April 2014 and March 2020, Plaintiff was assigned to the Circuit Court of Cook County, Sixth Municipal District, in Markham, Illinois ("Markham Courthouse"). (DSOF ¶¶ 1, 30; PRDSOF ¶¶ 1, 30.) Plaintiff used his insulin pump at work and tested his blood sugar once per shift while on break; he neither requested nor had any workplace accommodation related to his diabetes prior to March 2020. (DSOF ¶¶ 31, 32; PRDSOF ¶¶ 31, 32.)

Defendant Thomas J. Dart is the Sheriff of Cook County named in his official capacity for his role over CCSO.[3] (DSOF ¶ 5; FAC Count I.) Defendant Cook County is named solely as indemnitor. (FAC Count II.)

---

[2] Plaintiff has not complied with LR 56.1. In response to many of Defendants' proffered facts, rather than admitting or denying Defendants' facts, *see* LR 56.1(a)(2), (b)(2), (e)(1)-(3), Plaintiff only objects (*see, e.g.*, PRDSOF ¶¶ 3 (in part), 21, 24-29, 35-38, 41, 44-56, 59, 60 (in part), 66, 73-74), occasionally improperly offering factual additions despite standing on an objection (*see, e.g.*, PRDSOF ¶¶ 8-15, 17, 19, 22, 58). *See* LR 56.1(e)(2)-(3). Although the Court will not individually address each of Plaintiff's myriad objections to Defendants' factual statements, Plaintiff characterizes as immaterial many statements because the events occurred outside the date range Plaintiff assigns to his claims or Plaintiff does not purport to rely upon the fact or document. (*See, e.g.*, PRDSOF ¶¶ 8-15, 17, 19, 24-29, 33, 35-38, 41, 44-56, 73-74.)

For example, Plaintiff limits his claims to the period between July 20, 2020 (*see, e.g.*, PRDSOF ¶¶ 44-56; FAC ¶ 24 n.1) and his return to work on August 22, 2021, and objects to many facts outside that range on that ground. The objections are not well-founded, given that these facts provide important context; moreover, "[o]bjecting to materiality does not deny a fact." *Fenje v. Feld*, 301 F. Supp. 2d 781, 818 (N.D. Ill. 2003); LR 56.1(e)(2). Similarly, Plaintiff objects to Defendants' description of one letter (PRDSOF ¶ 75), because it "forms no part of" his claims; in support, he generally cites twenty-one paragraphs of his amended complaint. (PRDSOF ¶¶ 74, 73.) Plaintiff's obtuse objection, improperly rooted in so many paragraphs of the amended complaint without further explanation, *see* LR 56.1(e)(3), is decidedly unhelpful and non-compliant with LR 56.1. The Court overrules Plaintiff's objections to the extent Plaintiff seeks to avoid mention of background facts; the Court's *ruling* is grounded in facts material to the parties' dispute. The Court's factual recitation includes both contextual facts, whether Plaintiff purports to rely upon them, and facts germane to the dispositive legal issues, which Plaintiff either admits or which remain after the Court resolves any related supported dispute or objection.

[3] Because Dart is named as Defendant for his role over CCSO, which is Plaintiff's employer, the Court will refer to CCSO or Dart interchangeably throughout this memorandum opinion and order.

Joseph Bellettiere, Executive Director of CSD, in part referencing a March 23, 2018 "JOB DESCRIPTION – ESSENTIAL JOB FUNCTIONS"[4] checklist attached to his declaration, lists a CSDS's job functions at all relevant times as including: (1) maintaining security and order of courthouses; (2) engaging physically with citizens, detainees, arrestees, and courtroom staff in maintaining the safety and security of courthouses; (3) conducting physical searches of people and assigned areas; (4) transporting and supervising individual detainees and groups of detainees; and (5) operating screening equipment and working assigned security posts without assistance, sometimes for an entire eight to ten hour shift. (DSOF ¶¶ 43, 9.) Approximately ninety percent of a CSDS's day is spent "maintaining security and order" in the courthouse. (DSOF ¶ 10.) These functions require a CSDS to be physically present in the courthouse and may require that a CSDS be within six feet of other people. (DSOF ¶¶ 11-13.)

Plaintiff testified that his pre-March 2020 role as a CSDS at Markham Courthouse involved "primarily security" of the courthouse and courtrooms "wherever [] needed" and included, *inter alia*, patrolling inside and outside the courthouse, sitting behind prisoners during trial, providing security at the main doors, attending to the needs of jurors, escorting witnesses, moving inmates around the courtroom and to and from lock-up, and ensuring the safety of courthouse staff. (DSOF ¶¶ 16-19.) Plaintiff sometimes rotated between duty stations. (DSOF ¶ 19.) Providing security at the building entrance required Plaintiff to search personal property and individuals, sometimes

---

[4] Plaintiff asserts the term "essential functions" is "a legal conclusion" (PRDSOF ¶ 9), but whether a job function is essential is a factual determination that may be addressed at summary judgment. *See Tate v. Dart*, 51 F.4th 789, 801 (7th Cir. 2022). Because the Court will analyze the "essential" nature of CSDS job functions below in the manner the law requires, Plaintiff's objection is overruled, and the Court includes the facts pertinent to that determination. Relatedly, Plaintiff seeks judicial notice of a Cook County website he claims shows that Bellettiere's list of job functions is inaccurate because it "pre-dated the July 2020 changes to courthouse operations[.]" (PRDSOF ¶ 9 (citing https://www.cookcountyil.gov/content/cook-county-court-re-opening).) Defendants do not dispute that the Court may take judicial notice of the website (*see* DRPSOAF), so the Court assumes it may do so. *See Hansen v. United Airlines, Inc.*, No. 20-cv-2142, 2024 WL 1300500, at *3 (N.D. Ill. Mar. 27, 2024) (explaining that "[c]ourts may take 'judicial notice of information on official government websites that is not subject to reasonable dispute,'" and taking judicial notice of website regarding Costa Rican border closures related to Covid-19) (citations omitted). The website Plaintiff cites, though, does not list the job duties of a CSDS or in any way refute Bellettiere's CSDS job functions.

with physical pat-downs, and to check identification cards, which required close proximity to the individual. (DSOF ¶ 20.) It also was not possible for Plaintiff to securely move an inmate through the courthouse from six feet or greater. (DSOF ¶ 62.)

On March 9, 2020, Illinois Governor J.B. Pritzker declared all counties in the State of Illinois as disaster areas due to the COVID-19 global pandemic; on March 20, 2020, Governor Pritzker issued Executive Order 2020-10 directing that, due to the rapid spread of COVID-19, non-essential personnel should stay home under most circumstances. *See* Executive Order 2020-10 (COVID-19 Executive Order No. 8), *at* https://www.illinois.gov/government/executive-orders/executive-order.executive-order-number-10.2020.html (last visited Apr. 22 2024). Excepted from that order were personnel performing essential governmental functions, including law enforcement, correctional personnel, and court personnel. *See id*.

Meanwhile, on March 14, 2020, CCSO invoked a clause of Plaintiff's governing CBA, under which CCSO "ha[d] the right to take any and all actions as may be necessary to carry out the duties and responsibilities of [CCSO] in situations of civil emergency." (DSOF ¶¶ 21, 25.) CCSO thereafter re-assigned some employees based on departmental operational needs and vacancies. (DSOF ¶¶ 21, 23, 25.)

On March 27, 2020, CCSO emailed some employees regarding COVID-19 benefit time, indicating that the recipients had been identified as either "an emergency responder or an essential employee." (DSOF ¶ 24.) The email explained that the recipients were "excluded from coverage under the [Families First Coronavirus Response Act]" but that CCSO was granting them eighty hours of medical time for COVID-19 use under some circumstances. (DSOF ¶ 24.) Quickly thereafter, on April 1, 2020, CCSO altered sick leave policies, releasing any CSDS with an underlying health condition from work for an indefinite time if on medical leave, first using accrued benefit time, then unpaid. (DSOF ¶ 27.)

On April 20, 2020, Plaintiff elected to take leave[5]. (DSOF ¶ 39.) On April 23, 2020, suspecting he might be transferred to another CCSO division, Plaintiff requested accommodations for his Type I diabetes because his endocrinologist advised he could not "work[] in a known COVID-19 infected environment . . . where social distancing is impossible." (DSOF ¶¶ 35, 38.) Plaintiff submitted a letter from his physician and requested to remain a CSDS at Markham Courthouse, except with "strict social distancing." (DSOF ¶¶ 36, 37.)

On April 26, 2020, CCSO transferred multiple CSDSs, including Plaintiff, from CSD to the Department of Corrections ("DOC"). (DSOF ¶¶ 25, 39.) On April 27, 2020, CCSO reiterated any CSDS with a serious health condition and at risk of severe illness from COVID-19 could take leave with a medical note but explained that, "due to [] current staffing issues, alternative assignments are not available." (DSOF ¶¶ 28, 29.) Thus, a CSDS should request leave if "unable to work as assigned due to an underlying condition." (DSOF ¶ 29.)

While assigned to DOC, Plaintiff elected to take COVID-19 leave from May 3, 2020, through May 17, 2020, accrued medical leave from May 18, 2020, through May 23, 2020, then authorized unpaid leave beginning on May 24, 2020. (DSOF ¶¶ 39, 35, 37, 38, 47, 49, 50.) Plaintiff declined a temporary assignment he was offered to a DOC division that had no COVID-19 inmate quarantine or isolation tiers. (DSOF ¶¶ 53, 54.) On July 3, 2020, Plaintiff submitted to CCSO a new letter from his doctor, which indicated that he could return to work on July 19, 2020, with the following restrictions:

1. Avoid placing [Plaintiff] in a Covid-19 "rich" environment such as a lock-up, detention room, hospital, or indoor space where social distancing is not possible.
2. Allow [him] to wait 14 days after 7-5-2020 to return to work as many others returning to the same court facility have been placed previously in a jail assignment where multiple cases of Covid-19 are present.

---

[5] The parties do not identify the type of leave Plaintiff used.

5

3. Allow [him] to use his own personal PPE when work issued PPE is unavailable.
4. Allow [him] to work from home whenever possible.
5. Allow [him] to wash hands often.
6. Allow [him] to take every precaution to keep space between himself and others (6 feet, which is about two arm lengths).
7. Provide [him] proper PPE at all times.
8. Allow [him] to be distanced and separated from people who are showing any symptoms suspicious for Covid-19.
9. Allow [him] access to his diabetes supplies at all times (insulin, insulin pump supplies, glucose meter, CGM, glucose to correct hypoglycemia).
10. Ensure that high touch areas where [he] works are frequently cleaned and disinfected.
11. Allow [him] to call a healthcare professional if he has concerns about Covid-19 and his underlying medical condition or if he becomes sick at work.

(DSOF ¶ 57; PRDSOF ¶ 57.)

On July 5, 2020, CCSO transferred Plaintiff back to Markham Courthouse. (DSOF ¶ 39; DRPSOAF ¶ 1.) Additional Markham Courthouse operations, beyond true emergency matters, resumed on July 6, 2020. (DSOF ¶ 22; PSOAF ¶¶ 1, 3.) "[I]n person operations and services" remained "limited" and "staggered" with "most cases being conducted via videoconference to limit the number of individuals in court buildings" and no jury trials were taking place at this time. (PSOAF ¶¶ 3, 4; DRPSOAF ¶ 3) Temperature checks were conducted to bar access to anyone with a temperature of 100.4 degrees or higher, and social distancing and mask-wearing were required. (PSOAF ¶¶ 5-6.)

Rebecca Reierson, then CCSO Executive Director of Human Resources, whose duties included oversight of all CCSO human resource functions such as medical leave matters under the Americans with Disabilities Act ("ADA"), testified she spoke with Bellettiere regarding the restrictions in Plaintiff's July 2020 letter from his physician and determined some restrictions could not be met because CCSO could not guarantee whether Plaintiff might be near someone with symptoms suspicious for COVID-19 (like sneezing, coughing, runny nose, lethargy, and fever) or

might need to be in close proximity to a person in the courthouse, especially in an emergency situation. (DSOF ¶¶ 58-60.)[6] Reierson notified Plaintiff in part that she was uncertain whether he could "be exempted from working in the areas specified as it is part of the duties of a [CSDS]" and asked if there was a time limit on Plaintiff's physician's restrictions. (DSOF ¶ 61.) Plaintiff's "best guess" was that the restrictions were necessary until "an effective treatment" emerged. (PRSOF ¶ 61.) Several times thereafter, Plaintiff emailed Reierson and asked if CCSO at those points could accommodate his physician's restrictions at Markham Courthouse; if not, he requested an extension of authorized unpaid leave. (DSOF ¶ 63; PSOAF ¶ 8.) Reierson informed Plaintiff that CCSO could not accommodate the restrictions and continued his authorized unpaid leave. (DSOF ¶¶ 6, 65-67.)

On September 25, 2020, Reierson emailed Plaintiff to offer him a temporary assignment in the Electronic Monitoring Department ("EM"), conditioned upon Plaintiff passing a skills assessment test for the position. (DSOF ¶ 69.) She informed Plaintiff that the position likely would meet the restrictions Plaintiff's physician had set for Plaintiff. (DSOF ¶ 69.) Within days, Plaintiff took and unfortunately failed the EM skills assessment test. (DSOF ¶ 69.) Plaintiff was authorized for continued unpaid leave. (DSOF ¶ 67.)

Plaintiff then emailed Reierson a new restrictions letter from his physician, which was dated September 22, 2020.[7] (DSOF ¶¶ 68, 70.) That letter included the same eleven restrictions as the July 2020 letter except that it specified Plaintiff could return to work fourteen days after

---

[6]  Plaintiff objects to DSOF Paragraphs 58-60 as hearsay because Reierson purportedly based her testimony upon a conversation she had with Bellettiere regarding whether it was possible to meet the restrictions set forth in the letter from Plaintiff's physician. (PRDSOF ¶¶ 58-60.) But the relevant factual statements are not hearsay because they are not being offered for the truth of the matter asserted (i.e., that CCSO could not meet certain restrictions in Plaintiff's physician's letter) but rather for the effect on the listener. Fed. R. Evid. 801(c), (d). Even if the Court were to disregard these three paragraphs, however, the conclusion here would be unchanged because Bellettiere himself provided similar information to which Plaintiff has not raised a hearsay objection.

[7]  It appears that Plaintiff was already in possession of the letter on September 25, 2020, but did not send it to CCSO until *after* he learned he did not qualify for the EM position.

7

September 23, 2020, if the restrictions were met. (DSOF ¶ 68; PRDSOF ¶ 68.) CCSO again continued Plaintiff's approved unpaid leave, as nothing had changed regarding the requirements of the CSDS position. (DRPSOAF ¶ 8.) In response to a December 3, 2020, email from Plaintiff, Reierson responded that CCSO could not meet Plaintiff's physician's restrictions and would continue Plaintiff's authorized unpaid leave status. (DSOF ¶ 71; PRDSOF ¶ 71.)

Plaintiff received two additional restrictions letters from his physician in April 2021 and August 2021, both of which contained fewer restrictions than the earlier letters and provided new return-to-work dates. (DSOF ¶¶ 73, 75; PRDSOF ¶¶ 73, 75.) However, Plaintiff never provided the April 2021 letter to the CCSO, and the record does not reflect if or when he provided the August 2021 letter to the CCSO. (DSOF ¶ 74.)

The circumstances of Plaintiff's return to work are unexplained, but he resumed his Markham Courthouse CSDS position on August 22, 2021, in the same shift he occupied pre-pandemic, with no ADA restrictions or accommodations. (DSOF ¶¶ 76, 33; PRDSOF ¶ 76.) Unsurprisingly, while Plaintiff was on leave, between March 2020 and August 2021, twenty-two staff members, including CSDSs, at the Markham Courthouse tested positive for COVID-19. (DRPSOAF ¶ 3.) Plaintiff continues to work for CCSO; since December 2022, he has been assigned to Evictions in the Juvenile Courthouse at 1100 South Hamilton. (DSOF ¶ 2.)

## DISCUSSION

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material for the purposes of summary judgment if its determination by the trier of fact "might determine the outcome of the suit under the governing law," and a dispute respecting such a fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the" non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court

must "examine the record in the light most favorable to the [non-movant], construing all reasonable inferences from the evidence in [the non-movant's] favor," *Donaldson v. Johnson & Johnson*, 37 F.4th 400, 405-06 (7th Cir. 2022), but the non-movant "is not entitled to the benefit of inferences that are supported only by speculation or conjecture." *Boss v. Castro*, 816 F.3d 1004, 1011-12 (7th Cir. 2018); *see also Est. of Green v. City of Indianapolis*, 854 F. App'x 740, 746-47 (7th Cir. 2021) ("[S]peculation is not a valid basis . . . for defeating [a] motion for summary judgment.") (citations omitted).

"If there is no triable issue of fact on even one essential element of the nonmovant's case, summary judgment is appropriate." *Boss*, 816 F.3d at 916. Thus, "[w]hen a motion for summary judgment asserts that the [non-movant] cannot meet his burden of proof on a decisive issue, the [non-movant] must come forward with evidence sufficient to permit a finding in his favor that there is a genuine dispute of material fact." *Tate v. Dart*, 51 F.4th 789, 793 (7th Cir. 2022).

## I.  FAILURE TO ACCOMMODATE CLAIM

The ADA prohibits a covered employer from "discriminat[ing] against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). Plaintiff here brings a claim rooted in CCSO's alleged failure to provide a reasonable accommodation for his disability between July 20, 2020, and his return to work without accommodations or restrictions on August 22, 2021. *See* 42 U.S.C. § 12112(b)(5).

"Recovery under a failure to accommodate theory requires proof that (1) the plaintiff was a qualified individual with a disability; (2) the defendant was aware of the plaintiff's disability; and (3) the defendant failed to reasonably accommodate the plaintiff's disability." *Bruno v. Wells-Armstrong*, 93 F.4th 1049, 1053 (7th Cir. 2024) (citation omitted). For present purposes, the parties do not dispute Plaintiff had a disability—Type 1 diabetes—of which CCSO was aware. The dispute here, centers on whether Plaintiff was a qualified individual under the ADA.

9

A "qualified individual" is one "who, with or without reasonable accommodation, can perform the essential functions of" the relevant employment position. 42 U.S.C. § 12111(8); *see also* 29 C.F.R § 1630.2(n)(2). "Reasonable accommodations are modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position." *Leibas v. Dart*, No. 19-cv-7592, 2022 WL 971519, at *10 (N.D. Ill. Mar. 31, 2022) (cleaned up); *see also* 29 C.F.R. § 1630.2(o)(1)(ii). A requested modification is not reasonable if it would require the removal of an essential function from a position. *Majors v. General Elec. Co.*, 714 F.3d 527, 534 (7th Cir. 2013). A plaintiff cannot meet his burden of showing he could perform the essential functions with or without a reasonable accommodation "if the only accommodations suggested were unreasonable." *Id*.

Whether a job function is essential to the position is a question of fact, not law. *Tonyan v. Dunham's Athleisure Corp.*, 966 F.3d 681, 687 (7th Cir. 2020). The Court "usually [will] not 'second-guess the employer's judgment in describing the essential requirements of the job.'" *Id*. at 687-88 (quoting *DePaoli v. Abbott Labs.*, 140 F.3d 668, 674 (7th Cir. 1998)). Although the employer's judgment is entitled to "some degree of deference," it "is not necessarily decisive"; "[c]areful attention to . . . other evidentiary factors can counter the employer's judgment." *Tate*, 51 F.4th at 794-95 (citations omitted). Those other evidentiary factors, which are set forth within the regulations implementing the ADA, include any "[w]ritten job descriptions," the amount of work time spent performing that function, consequences of not requiring performance of the function, terms of a CBA, work experience of past performers of the job, or current experience of those in similar jobs. *Id*. at 794 (citing 29 C.F.R. § 1630.2(n)(3)).

> That courts must consider such evidence where available does not change the fact that it is the plaintiff who bears the burden of proof on this issue, both at summary judgment and at trial. [] So where the

10

> defendant adduces evidence tending to prove that a function is essential—and the plaintiff concededly cannot perform that function—the plaintiff must come forward with evidence [] sufficient to create a genuine dispute on that question. Otherwise, judgment for the Defendant must follow.

*Moore v. PNC Bank*, No. 19-cv-2707, 2023 WL 4105940, at *8-9 (N.D. Ill. June 21, 2023) (citations omitted).

> **A.      The Essential Functions of a CSDS Require Potential Physical Proximity to Individuals and Prevent Strict Separation from Symptomatic Individuals.**

It is undisputed that the essential functions of a CSDS at all relevant times were to: (1) maintain security and order of all courthouses; (2) engage physically with citizens, detainees, arrestees, and courtroom staff in maintaining the safety and security of all courthouses; (3) conduct physical searches of people and assigned areas; (4) transport and supervise individual detainees and groups of detainees; and (5) operate screening equipment and work assigned security posts without assistance, sometimes for an entire eight to ten hour shift. (DSOF ¶¶ 43, 9.) The evidence also is undisputed that about ninety percent of a CSDS's time is spent maintaining security and order in the courthouse, that a CSDS cannot perform the listed duties from home, and that some duties inherently may require a CSDS to be within six feet of other individuals. (DSOF ¶ 10.) Plaintiff himself similarly described his CSDS position before he began his leave in 2020 as "primarily" requiring him to secure the courthouse and courtrooms, rotating between stations as needed, and he agreed that functions like conducting physical pat-downs, checking identification, and handling detainees sometimes required physical proximity.[8] Plaintiff's description of the "reality on the ground" of his position, *Tonyan v. Dunham's Athleisure Corp.*, 966 F.3d 681, 688

---

[8] Plaintiff does not argue he could have performed his duties from home. In any event, Defendants have demonstrated the CSDS essential security functions required in-person performance. *See, e.g., Smithson v. Austin*, 86 F.4th 815, 821 (7th Cir. 2023) (holding that plaintiff teacher was "not a qualified individual as a matter of law" because her position required in-person attendance as an essential function and she was regularly unable to attend for up to one-fourth of the workday); *Kinney v. St. Mary's Health, Inc.*, 76 F.4th 635, 645 (7th Cir. 2023) (finding that evidence demonstrated that hospital employee plaintiff "could not perform [her] essential functions . . . without being in person . . . for a significant portion of her workweek").

(7th Cir. 2020), is consistent with CCSO's description of essential functions. Thus, Plaintiff does not counter CCSO's description of the essential functions of a CSDS, and functionally concedes the accuracy of description of the essential functions of his role. *See Leibas*, 2022 WL 971519, at *2-3 (explaining that plaintiffs did not create genuine dispute of material fact by asserting that not all assignments required all essential functions or that there might be some subsets of the job description that a plaintiff might perform), *amended on recon. on other grounds,* No. 19-cv-7592, 2022 WL 17752389 (N.D. Ill. Dec. 19, 2022).

Plaintiff argues that the essential functions of a CSDS changed following the limited reopening of Markham Courthouse in July 2020 (*see* Dkt. 77 at 7), but points to no evidence beyond directing the Court to public websites about courthouse reopening procedures to support his argument. None of the websites describe the functions of a CSDS. Even if the Court assumes the continued abeyance of jury trials and limited in-person proceedings resulted in minimal detainee transportation and courtroom oversight of witnesses, this does not meaningfully impact most of the listed essential functions of a CSDS. Plaintiff did not work in the Markham Courthouse between July 20, 2020, and August 22, 2021, and failed to cite any evidence from any CSDS who did and who could therefore identify if any of the essential functions of a CSDS were in fact different during that period. *See Tate*, 51 F.4th at 794; 29 C.F.R. § 1630.2(n)(3)(vi)-(vii) (listing types of evidence relevant to determining essential functions). There also is no evidence that Plaintiff's CSDS position differed in its essential functions when he returned to it on August 22, 2021. *See Tate*, 51 F.4th at 794; 29 C.F.R. § 1630.2(n)(3)(vi)-(vii); *see also* DRPSOAF ¶ 3; Circuit Court of Cook County, Court Operations and the Coronavirus, *at* https://www.cookcountycourt.org/HOME/INFORMATION-REGARDING-CORONA-VIRUS (indicating in entry Plaintiff cites that, as of July 6, 2020, sentencing hearings would proceed) (last visited Apr. 12, 2024). Plaintiff's speculation as to courthouse operations during his absence or

theoretical assignments he might have received had he worked in the courthouse during that time (*see, e.g.,* PRDSOF ¶¶ 14, 17, 19, 20) cannot carry his burden on summary judgment. *See Weaver v. Speedway, LLC*, 28 F.4th 816, 824–25 (7th Cir. 2022) ("Although [plaintiff] may testify to matters within her personal knowledge and is entitled to reasonable inferences from that knowledge, speculation as to what might have occurred . . . is not within her personal knowledge and cannot be used to defeat summary judgment.") (citations omitted); *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003) ("Although personal knowledge may include reasonable inferences, those inferences must be grounded in observation or other first-hand personal experience. They must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience.") (cleaned up).

Plaintiff does not point to any other evidence undermining CCSO's description of the CSDS essential functions. Despite not being addressed by either party, the Court nevertheless examines the other factors within 29 C.F.R. § 1630.2(n)(3) and case law regarding the essential functions of a CSDS. Neither party points to the CBA, *see Tate*, 51 F.4th at 798 (examining CBA in similar claim); 29 C.F.R. § 1630.2(n)(3)(v), as providing relevant information (beyond the provision the CCSO invoked when temporarily reassigning staff in March and April 2020), and the CBA itself is not within the summary judgment record. An analysis of this factor therefore does not affect the analysis of a CSDS's essential functions.

Moreover, because it is undisputed a CSDS spends a significant portion of each shift on in-person security functions in which social distancing or separation from potentially symptomatic individuals is not assured, *see* 29 C.F.R. § 1630.2(n)(3)(iii), not requiring those functions of a CSDS would keep the CSDS from doing a large portion of what the parties agree the job entails, impacting a CSDS's ability to ensure courthouse security. Moreover, courthouse emergencies may occur (DSOF ¶ 58), and an "emergency itself dictates when action must be taken." *See Tate*, 51

F.4th at 796-98 (discussing essential functions of CCSO DOC correctional officer). Exempting a CSDS from responding to a security emergency that required the CSDS to be within six feet of another or to approach someone with symptoms suspicious for COVID-19 might "be innocuous" but could have "grave" consequences. *Id*. at 796-97; *see also* 29 C.F.R. § 1630.2(n)(3)(iv). An analysis of these factors therefore is consistent with CCSO's description of a CSDS's essential functions.

On this record, the Court finds the functions CCSO identified are the essential functions of a CSDS for the purposes of the ADA at all relevant times and that those essential functions may require physical proximity to others, prevent strict separation from individuals who might be symptomatic for COVID-19, and not allow for frequent handwashing. *See Patel v. DeJoy*, 19-cv-3331, 2023 WL 6961561, at *8-9 (N.D. Ill. Oct. 20, 2023) (hold[ing] that the ability to walk and stand is, in fact, an essential function" because, although employer's written job description did not identify "'walking' or 'standing,' it implie[d] that both [we]re necessary for the job and required for long periods," which was reinforced by evidence of "the 'reality on the ground'"). Plaintiff has not identified any genuine dispute as to those functions.

**B.      Plaintiff is Not a Qualified Individual with a Disability.**

Plaintiff could not perform the essential functions of the CSDS position under the restrictions Plaintiff's physician detailed. Plaintiff nevertheless argues he could have performed the essential functions of his CSDS job with accommodations. For instance, he suggests that "social distancing [must be] possible everywhere at Markham Courthouse . . . given that the Chief Judge was requiring it" and that the parties could have negotiated a way for Plaintiff to maintain social distance. (Dkt. 77 at 6.) There are two problems with this argument. First, proclaiming that the general public must maintain social distancing does not, standing alone, prove it is possible to keep six feet between individuals at all places within all covered buildings; the evidence, which

14

Plaintiff has not otherwise countered, is that it is impossible to maintain six feet of separation in all areas of Markham Courthouse and that, even if it were logistically feasible, a CSDS's duties might without warning require him to be within six feet of another person. Second, because Plaintiff's doctor required that he "avoid indoor space[s] where social distancing [wa]s not possible," the CCSO was not free to seek to negotiate a different limitation. "'Avoid' means 'avoid.'" *Tate*, 51 F.4th at 801. It "does not mean 'only occasionally' or 'limit,'" but is "more prohibitive[,]" defined as "'to keep away from, to prevent the occurrence or effectiveness of,' and 'to refrain from.'" *Id*. "An employer must respect a medical limitation . . . according to its plain meaning[,]" and a plaintiff "is not entitled to ask a jury to bend the meaning of those restrictions." *Id*. at 801-02. CCSO therefore was not free to negotiate with Plaintiff as to an alternative meaning of avoiding spaces where social distancing was not possible.

Plaintiff also has not pointed to any other *reasonable* accommodation for his doctor's requirement that he be kept "separate" from anyone with symptoms suspicious for COVID-19. Although Plaintiff suggests the parties could have "agreed" that Plaintiff "would wear more or other agreed-upon PPE . . . to enable him to interact with anyone with such symptoms" (Dkt. 77 at 8), again, such an agreement does not comport with the plain language of Plaintiff's doctor's requirement that Plaintiff be separated from potentially symptomatic individuals. CCSO simply cannot rewrite a doctor's prescribed restriction. *See Hirlston v. Costco Wholesale Corp*., 81 F.4th 744, 754 (7th Cir. 2023) ("An employer is entitled—and required—not to permit employees to exceed their doctor's restrictions, even if they think they can.") (cleaned up). Plaintiff also does not explain how CCSO realistically might have "alert[ed]" him to the presence of individuals with symptoms suspicious of COVID-19 (*see* Dkt. 77 at 9) prior to any potential contact with Plaintiff, especially because Plaintiff could be assigned to security at the main door. This is bolstered by the

15

fact that twenty-two Markham Courthouse employees, including CSDSs, contracted COVID-19 while Plaintiff was on leave.

Given that a CSDS was required to work wherever needed throughout the courthouse and rotate stations, it would be unreasonable for Plaintiff to expect to be assigned to only a subset of essential security functions (or a subset of locations within the courthouse) to alter the risk that he might closely encounter such suspiciously symptomatic individuals, *Leibas*, 2022 WL 971519, at *11, or even to require that another employee relieve Plaintiff while he performed the required "frequent" handwashing, *see Leibas*, 2022 WL 17752389, at *12 ("Especially given CCSO's short supply of labor, it is not a reasonable accommodation for CCSO to send another officer to relieve [plaintiff] of her duties during unplanned breaks."). *See also Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 288-89 (7th Cir. 2015) ("We have repeatedly held that to have another employee perform a position's essential function, and to a certain extent perform the job for the employee, is not a reasonable accommodation.") (cleaned up).

Plaintiff suggests that CCSO should have accommodated his doctor's restrictions in another fashion. (Dkt. 77 at 10-11, 14-18.) But he does not identify another accommodation that comports with the doctor's instructions, short of the accommodations CCSO offered Plaintiff, which included: (1) an open EM position anticipated to comply with all of his doctor's restrictions (contingent upon Plaintiff passing the required examination, which did not occur); and (2) approval of long-term leave (that the ADA would not have required of CCSO) so that Plaintiff would not be forced to choose between losing his job and working under conditions that did not meet his doctor's instructions. *See, e.g.*, *Leech v. Maine Twp. Sch. Dist. 207*, No. 19-cv-1826, 2023 WL 6388159, at *2 (N.D. Ill. Sept. 29, 2023) ("[T]he ADA does not require employers to extend a months-long medical leave to an employee who cannot work, nor does it require employers to

16

extend indefinitely an absence that has already lasted 90 days.") (citing *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 479 (7th Cir. 2017)).

On this record, Plaintiff has not shown a genuine question of material fact as to whether he could, at the operative time, fulfill the essential CSDS security functions without a reasonable accommodation, and he also has not suggested any reasonable accommodation.[9]

### C. Plaintiff Has Not Created a Genuine Issue of Material Fact as to Whether CCSO Meaningfully Engaged in ADA-Required Interactive Process.

Plaintiff finally faults the CCSO for, in Plaintiff's view, not meaningfully engaging in an interactive process to negotiate a way for Plaintiff to return to his CSDS position at Markham Courthouse between July 2020 and August of 2021. (Dkt. 77 at 14-18.) It is well settled, though, that the failure of an employer to engage in the "flexible, interactive process" the ADA envisions "the employer and employee [will use to] determine [an] appropriate reasonable accommodation" is not, alone, a "bas[is for] a reasonable accommodation claim." *Rehling v. City of Chi.*, 207 F.3d 1009, 1015-16 (7th Cir. 2000); *see Spurling v. C&M Fine Pack, Inc.*, 739 F.3d 1055, 1062 (7th Cir. 2014) (explaining that failure to engage in interactive process only is actionable if it prevents identification of an appropriate accommodation for qualified individual); *Dargis v. Sheahan*, 526 F.3d 981, 988 (7th Cir. 2008) (holding that "the Sheriff's Office showed . . . correctional officers need to be able to rotate through all positions for reasons of safety and inmate control" and, despite brief interactive process, "no further interactive process" was "necessary" because "Sheriff's Office . . . show[ed] that no reasonable accommodation was possible"). Plaintiff identifies no reasonable accommodation compliant with the plain language of his doctor's requirements that may have been overlooked because of a breakdown in the interactive process and therefore has not

---

[9] Given the Court's resolution of these issues, the Court need not resolve Defendants' argument that "Plaintiff's multi-month absence disqualified him from ADA protection." (Dkt. 69 at 15.) The Court, though, is skeptical that CCSO choosing to approve an extensive unpaid leave for Plaintiff (despite the ADA not necessarily requiring CCSO to do as noted above) would itself result in Plaintiff being deemed not to be a qualified individual under the ADA.

shown a genuine dispute of material fact as to any failure to engage in the interactive process. *See Valsamis v. John Crane Inc.*, No. 18-cv-7079, 2023 WL 3886105, at *10 (N.D. Ill. June 8, 2023). Dart is therefore entitled to judgment on Plaintiff's failure to accommodate claim.

## II.     INDEMNIFICATION CLAIM

Because Defendant Dart is entitled to summary judgment on the failure to accommodate claim, the only count against him, no claims survive for Cook County to indemnify. Accordingly, Cook County is entitled to summary judgment. *Albarran v. Dart*, No. 21-cv-1024, 2024 WL 182230, at *6 (N.D. Ill. Jan. 17, 2024).

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion for summary judgment. Judgment shall enter in favor of Defendants Cook County Sheriff Thomas J. Dart and County of Cook and against Plaintiff Nicholas Adduci. This civil case is terminated.

ENTERED: April 26, 2024

_____
Hon. Keri L. Holleb Hotaling
United States Magistrate Judge